# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **DONISE REITZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:12CV117SNLJ** |
| | ) | |
| **NATIONSTAR MORTGAGE, LLC.,** | ) | |
| **ET. AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM</u>

Plaintiff has filed this putative class action seeking recovery for defendant Nationstar Mortgage's failure to permanently modify her home mortgage loan under the federal government's Home Affordable Modification Program (HAMP). Plaintiff seeks redress for herself and the putative class pursuant to claims for breach of contract (Count I), promissory estoppel (Count II), breach of the implied covenant of good faith and fair dealing (Count III), and violations of the Missouri Merchandising Practices Act (MMPA)(Count IV). This matter is before the Court on defendant Nationstar Mortgage's (hereinafter simply referred to as Nationstar) Rule 12(b)(6) motion to dismiss [13], filed March 23, 2012.[1] After several extensions of time and numerous responsive pleadings and supplementation of same, this matter is now ripe for disposition.

The purpose of a Rule 12(b)(6) motion to dismiss is to test the legal sufficiency of a complaint so as to eliminate those actions "which are fatally flawed in their legal premises and

---

[1]On June 18, 2012 co-defendant Fortress Investment Group was dismissed from this cause of action leaving only defendant Nationstar in the lawsuit. *See*, Order [38].

designed to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity."

Young v. City of St. Charles, 244 F.3d. 623, 627 (8th Cir. 2001) *quoting* Neitzke v. Williams,

490 U.S. 319, 326-27 (1989). A complaint must be dismissed for failure to state a claim upon

which relief can be granted if it does not plead "enough facts to state a claim to relief that is

plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 570 (2007)(abrogating the

prior "no set of facts" standard set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). Courts

"do not require heightened fact pleading of specifics, but only enough facts to state a claim to

relief that is plausible on its face." Id., 550 U.S. at 555. A complaint must set forth factual

allegations which are enough to "raise a right to relief above the speculative level." Id., 550 U.S.

at 555. However, where a court can infer from those factual allegations no more than a "mere

possibility of misconduct," the complaint must be dismissed. Cole v. Homier Distributing Co.,

Inc., 599 F.3d. 856, 861 (8th Cir. 2010)(*citing* Ashcroft v. Iqbal, - U.S. -, 129 S.Ct. 1937. 1950

(2009)).

In passing on a motion to dismiss, a court must view the allegations of the complaint in

the light most favorable to the plaintiff. Scheuer v. Rhodes, 416 U.S. 232 (1974); Kottschade v.

City of Rochester, 319 F.3d. 1038, 1040 (8th Cir. 2003). While a complaint challenged by a

Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff must still provide the

grounds for relief, and neither "labels and conclusions" nor "a formulaic recitation of the

elements of a cause of action" will suffice. Bell Atlantic Corp. v. Twombly, 550 U.S. at

555.(internal citations omitted). "Although the pleading standard is liberal, the plaintiff must

allege facts – not mere legal conclusions – that, if true, would support the existence of the

claimed torts." Moses.com Securities v. Comprehensive Software Systems, Inc., 406 F.3d. 1052,

1062 (8th Cir. 2005) *citing* Schaller Tel. Co. v. Golden Sky Systems, 298 F.3d. 736, 740 (8th Cir.

2002).  In viewing the complaint in the light most favorable to the plaintiff, the court should not dismiss it merely because the court doubts that the plaintiff will be able to prove all of the necessary allegations.  Bennett v. Berg, 685 F.2d. 1053, 1058 (8th Cir. 1982).  The primary issue for a court to consider is not whether the plaintiff will ultimately prevail in the lawsuit, but whether the complaint adequately states a claim; and therefore, the plaintiff is entitled to present evidence in support of that claim.  A complaint may not be dismissed based upon a district court's assessment that the plaintiff will fail to present evidentiary support for the complaint's allegations or will ultimately fail to prove one or more claims to the satisfaction of the factfinder. Bell Atlantic Corp. v. Twombly, 550 U.S. at 556; Neitzke v. Williams, 490 U.S. at 327 ("What Rule 12(b)(6) does not countenance are dismissals based upon a judge's disbelief of a complaint's factual allegations.")   However, "[w]here the allegations show on the face of the complaint there is some insuperable bar to relief, dismissal under Rule 12(b)(6) is appropriate." Benton v. Merrill Lynch & Co., 524 F.3d. 866, 870 (8th Cir. 208).  Further, courts "'are not bound to accept as true a legal conclusion couched as a factual allegation.'" Ashcroft v. Iqbal,  - U.S. -, 129 S.Ct. 1937. 1950 (2009)(*quoting* Twombly, 550 U.S. at 555).  When considering a motion to dismiss, a court can "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Ashcroft v. Iqbal, 129 S.Ct. at 1950.  Legal conclusions must be supported by factual allegations to survive a motion to dismiss. Ashcroft v. Iqbal, 129 S.Ct. at 1950.  With this plausibility standard in mind, this Court turns to an examination of the plaintiff's complaint.

Normally, when reviewing a Rule 12(b)(6) motion, documents outside the pleadings are presented and not excluded, the motion must be treated as a motion for summary judgment.  Rule 12(d) Fed.R.Civ.Pro.  Documents that are necessarily embraced by the pleadings are not "matters

outside the pleadings" for purposes of Rule 12(d). Enervations, Inc. v. Minnesota Mining & Mfg. Co., 380 F.3d. 1066, 1069 (8th Cir. 2004); *see also*, Zoltek Corp. v. Structural Polymer Group, 2008 WL 4921611, *2 (E.D.Mo. 2008) *rev. on other gds.* Zoltek Corp, at 592 F.3d. 893 (8th Cir. 2010). A court need not convert a Rule 12(b)(6) motion to dismiss into on for summary judgment under Rule 12(d) if the matters presented are incorporated by reference, are integral to the claim, or are exhibits whose authenticity is unquestioned. Miller v. Redwood Toxicology Lab, Inc., 688 F.3d. 928, 931 (8th Cir. 2012); Brown v. Intelius, Inc., 2012 WL 5878230, *2, n.3 (E.D.Mo. Nov. 21, 2012)(*citing* Miller, *supra.*). The documents attached to the Complaint and responsive pleadings are necessarily embraced by the pleadings and can be considered under the instant 12(b)(6) motion without converting the instant dismissal motion to a motion for summary judgment. In making its ultimate decision, the Court has not considered any other exhibits that may have been filed by either party that are not necessarily embraced by the pleadings.

Finally, given the substance of this dispute, the Court has elected to take judicial notice of the operative HAMP Guidelines, as published by the United States Department of the Treasury, and set out in defendant Nationstar's Exhibits A-C (attached to the instant motion). *See*, Caha v. United States, 152 U.S. 211, 221-22 (1894)(" . . . that wherever, by the express language of any act of congress, power is intrusted to either of the principal departments of government to prescribe rules and regulations for the transaction of business in which the public is interested, and in respect to which they are to be controlled, the rules and regulations prescribed in pursuance of such authority become a mass of that body of public records of which the courts take judicial notice."); *see also,* Kiluk v. Select Portfolio Servicing, Inc., 2011 WL 8844639, *1, n.3 (D.Mass. Dec. 19, 2011)(district court takes judicial notice of the HAMP Guidelines as

matter of public record and not necessitating converting a Rule 12(b)(6) motion to dismiss into a motion for summary judgment).

The following facts are taken from the plaintiff's class action complaint, documents attached, and those documents referenced above; and thus, are regarded as true for purposes of the instant motion to dismiss.

In 2009, in response to the failing economy's significant affect on the mortgage industry especially as to the rising number of mortgage loan defaults, the federal government instituted the Home Affordable Modification Program (hereinafter referred to as "HAMP"). Specific guidelines were established and published by the U.S. Department of the Treasury (HAMP Guidelines) which set forth the scope of the program, and more importantly, the participating loan servicer obligations under HAMP. *See*, Defendant's Exhibit A.

HAMP was designed to assist distressed homeowners by encouraging banks (loan servicers) to modify the terms of outstanding mortgage agreements, and thereby, making a homeowner's monthly mortgage payment more affordable. HAMP is funded by federal funds through the U.S. Treasury Department's Troubled Asset Relief Program (TARP). Loan servicers participating in HAMP receive financial incentives, via TARP, for each HAMP modification. *See*, Citimortgage, Inc. v. Crawford, et. al., 2013 WL 1225387, *1 (S.D. Ohio, March 26, 2013); Williams, et. al. v. Geithner, et. al., 2009 WL 3757380, *2 (D.Minn. November 9, 2009). Defendant Nationstar voluntarily participated in HAMP receiving TARP funds for each HAMP modification.

Under HAMP, a loan servicer "will use a uniform loan modification process to provide a borrower with sustainable monthly payments." Defendant's Exhibit A, pg. 1. The HAMP Guidelines provide "threshold criteria" for consideration of eligible homeowners. Defendant's

Exhibit A, pg. 2. If the mortgagee meets the "threshold criteria," the HAMP Guidelines set forth

a mandatory set of steps ("Standard Modification Waterfall") the loan servicer must apply, in a

prescribed order, to achieve a "target monthly mortgage payment", defined as 31% of the

mortgagee's gross monthly income. Defendant's Exhibit A, pgs. 8-10; *see also*, Williams v.

Geithner, at *3. The HAMP Guidelines further explain that "participating servicers are required

to consider all eligible mortgage loans unless prohibited by the rules of the applicable PSA

**[pooling and servicing agreement]** and/or other investor servicing agreements. Defendant's

Exhibit A, pg. 1.

The HAMP Guidelines provide for a loan servicer to obtain recent verbal financial

information from the borrower (and any co-borrower) ninety (90) days or less from the date the

servicer is determining HAMP eligibility to assess the borrower's eligibility. Such verbal

financial information may be used by the servicer to send the borrower a solicitation for the

HAMP and an offer of a Trial Plan Period (TPP). Defendant's Exhibit A, pg. 5. In the

alternative, a servicer may require a borrower to submit the required documentation to verify the

borrower's eligibility and income prior to preparing a TPP. Upon receipt of such documentation

and determination of the borrower's eligibility, the servicer may prepare and send to the borrower

a letter indicating that the borrower is eligible for the HAMP together with a TPP. Defendant's

Exhibit A, pg. 5-6.

A borrower will only qualify for the HAMP if the verified income documentation

confirms that the monthly mortgage payment ratio **prior** to the modification is greater than 31%.

The "monthly mortgage payment ratio" is the ratio of the borrower's current monthly mortgage

payment to the borrower's current monthly gross income. In determining this ratio, the HAMP

Guidelines set out specific factors the servicer may and may not consider. Defendant's Exhibit A, pg. 6.

Assuming a borrower has met the "threshold criteria" including the "monthly mortgage payment ratio," servicers must use a two-step process for HAMP modifications. Step One (1) involves providing the borrower with a document known as the TPP Agreement. The TPP Agreement "is designed with HAMP as the source of its governing principles." Citimortgage v. Crawford, at *1; *see also,* Defendant's Exhibit A, pgs. 5-6, 14-15, 17-18. Step Two (2) provides the borrower with a final loan modification agreement outlining the revised monthly payments and other obligations/terms of the final modification.

Again, in Step One (1), the servicer provides the borrower with a TPP Agreement which sets out a three-month period in which the borrower makes temporarily modified monthly mortgage payments. These temporarily reduced mortgage payments are based on a formula using the initial financial information gathered by the servicer. Defendant's Exhibit A, pg. 17. The borrower must be current under the terms of the TPP at the end of the trial period in order to receive a permanent loan modification. Defendant's Exhibit A, pg. 17.

However, simply providing financial information to the servicer and making the required TPP payments are not only factors that must be considered in providing the borrower with a permanent loan modification. If the borrower executes the TPP Agreement, makes the three (3) required TPP monthly payments, **and meets all of the requirements of the HAMP**, Step Two (2) is triggered, and the borrower is offered a permanent loan modification. Citimortgage v. Crawford, at *1; Williams v. Geithner, at *3.

The HAMP Guidelines provides in pertinent part:

> All loans that meet the HAMP eligibility criteria and are either
> deemed to be in imminent default (as described above) or 60 or

- 7 -

more days delinquent must be evaluated using a standardized NPV[2] test that compares the NPV result for a modification to the NPV result for no modification. If the NPV result for the modification scenario is greater that the NPV result for no modification, the result is deemed 'positive' and the servicer MUST offer the modification. If the NPV result for no modification is greater than NPV result for the modification scenario, the modification result is deemed 'negative' and the servicer has the option of performing the modification in its discretion.

Defendant's Exhibit A, pg. 4.

The Handbook for Servicers of Non-GSE Mortgages[3], Chapter II - HAMP, Subsection 1-Eligibility; Subsection 1.1 HAMP Eligibility Criteria provides that "[A] loan is eligible for Home Affordable Modification Program (HAMP) if the servicer verifies that **all of the following criteria are met**." Defendant's Exhibit C (attached to the instant motion), pg. 51 (emphasis added). One of these required criteria is entitled "Minimum monthly mortgage payment ratio" and defined as: "The borrower's monthly mortgage payment (including principal, interest, taxes, insurance, and when applicable, association fees, existing escrow shortages) prior to the modification is greater than 31 percent of the borrower's verified monthly gross income." Defendant's Exhibit C, pg. 51. The Handbook further provides that "[A] borrower who has been evaluated for HAMP, but does not meet the minimum eligibility criteria described in Section 1.1, or who meets the minimum eligibility criteria, but is not qualified for HAMP by virtue of a negative NPV test result, excessive forbearance or other financial reason, may request

---

[2]Net Present Value. This is an accounting calculation set out in detail in the Handbook for Servicers of Non-GSE Mortgages, Chapter II - HAMP, Subsection 7-Net Present Value (NPV) Testing, Subsection. Defendant's Exhibit C, *infra.*

[3]Mortgage loans not owned or guaranteed by federal government programs FannieMae or FreddieMac.

reconsideration for HAMP at a future time if they experience a change in circumstance.".

Defendant's Exhibit C, pg. 53.

Thus, the HAMP Guidelines, and standardized loan servicer obligations contemplate instances wherein an HAMP applicant may be eligible initially by meeting the threshold criteria but ultimately is determined not qualified for HAMP due to a negative NPV test result. Under such a scenario, HAMP does not require the loan servicer to modify the loan. *See*, Williams v. Geithner, at *3.

Finally, pursuant to the HAMP Guidelines, if the loan servicer determines that the borrower is not eligible for the HAMP based on verified income (due to a negative NPV test), the servicer must notify the borrower of such determination and any trial period payments (i.e., TPP payments) made by the borrower will be applied to the mortgage loan in accordance the borrower's current loan documents. Defendant's Exhibit A, pg. 18.

In 2006, plaintiff (and her former spouse) took out a mortgage loan on a home located in Ballwin, Missouri. Plaintiff's Complaint [1], ¶31. By early 2009, plaintiff began suffering financial setbacks and had trouble making her mortgage payments. *Id.*, ¶32. On June 23, 2009 she applied for a HAMP loan modification with defendant Nationstar by sending defendant a completed application and "all requested financial information". *Id.*, ¶¶34-35; Plaintiff's Exhibit C.

On July 10, 2009, plaintiff received a letter from defendant offering the plaintiff a HAMP TPP to reduce her monthly mortgage payments for a trial period of four (4) months while defendant reviewed the plaintiff's eligibility for a permanent loan modification. *Id.*, ¶36; Plaintiff's Exhibit D. The cover letter enclosing the plaintiff's TPP Agreement (Plaintiff's Exhibit F) states that the plaintiff "may qualify" for HAMP. It further states that "[I]f you qualify

under the federal government's Home Affordable Modification program **[HAMP]** and comply

with the terms of the Trial Period Plan **[TPP]**, we will modify your mortgage loan and you can

avoid foreclosure." Plaintiff's Exhibit D. The letter further states that the TPP payments are

based upon the financial information plaintiff had previously supplied with her HAMP

application and cautions the plaintiff that the TPP payments "are also our estimate of what your

payment will be IF we are able to modify your loan under the terms of the program." Plaintiff's

Exhibit D. The letter further provides "two scenarios" which can occur if the requested income

information does not support the income amount previously provided: 1) the TPP payment may

change; and 2) "You may not qualify for this loan modification program." Plaintiff's Exhibit D.

Finally, the letter sets out all of the financial and other pertinent information that defendant

required in order to determine if plaintiff qualified under HAMP.

The TPP Agreement provides that plaintiff is providing requested information "to permit

verification of all of my income . . . to determine whether I [plaintiff] qualify for the **Offer**

**described in this Plan (the 'Offer').** Plaintiff's Exhibit F (emphasis added). The TPP

Agreement further provides that it is "not a modification of the Loan Documents," that "all terms

and provisions of the Loan Documents remain in full force and effect," that the TPP Agreement

should not "be understood or construed to be a satisfaction or release in whole or in part of the

obligations contained in the Loan Documents," and that the TPP Agreement would not "take

effect unless and until both [plaintiff and defendant] sign it and [defendant] provides [plaintiff]

with a copy of this Plan with the [defendant's] signature." Plaintiff's Exhibit F. The TPP

Agreement further provides that "I [plaintiff] understand that after I sign and return two copies of

this Plan to the Lender [defendant], the Lender [defendant] will send me a signed copy of this

Plan **if I qualify for the Offer or will send me written notice that I do not qualify for the**

**Offer.**" Plaintiff's Exhibit F (emphasis added).  The TPP Agreement further states:

> If I [plaintiff] am in compliance with this Trial Period Plan
> (the 'Plan') and my representations in Section 1 continue to be
> true in all material respects, then the Lender [defendant] will
> provide me with a Home Affordable Modification Agreement
> ('Modification Agreement'), as set forth in Section 3, that would
> amend and supplement (1) the Mortgage on the Property, and (2)
> the Note secured by the Mortgage.

Plaintiff's Exhibit F.

On July 28, 2009 plaintiff executed the TPP Agreement and provided the requested

copies and  information to defendant.  Plaintiff's Exhibit E.  Between July 2009 and January

2010 plaintiff made the required TPP payments and provided additional information as requested

by the defendant.  *Id.*, ¶¶38-54; Plaintiff's Exhibit J.  On January 18, 2010 defendant informed

the plaintiff, by phone, that she did not qualify for a permanent HAMP modification.  *Id.*, ¶56.

On February 10, 2010 defendant sent plaintiff a letter denying the HAMP modification stating

that she did not meet the HAMP program guidelines because of "**Excessive Forbearance**." We

are unable to offer you a Home Affordable Modification because we are unable to create an

affordable payment equal to 31% of your reported monthly gross income without changing the

terms of your loan beyond the requirements of the program." *Id.*, ¶61; Plaintiff's Exhibit O.

When plaintiff entered into the TPP Agreement, her mortgage loan was current; i.e. there

had been no missed mortgage payments.  During the TPP period, plaintiff made all the TPP

payments in full and on time.  *Id.*, ¶60.  However, during the TPP period, plaintiff was notified

on at least three (3) occasions that her mortgage loan was in default due to missed payments.  *Id.*,

¶¶48, 52, 55.  Plaintiff was given this conflicting information regarding this "default" and

ultimately paid $8157.00, including a $77.90 late fee charge in order to cure the "default."  *Id.*,

¶¶57-59.  Plaintiff was also charged for $93.24 for a "property inspection" which was never conducted.  *Id.*, ¶¶64-67.

The crux of the plaintiff's complaint is that the TPP Agreement constitutes a contract between the plaintiff and the defendant which stipulated that if she made the required payments and provided the requested information, she would be provided with a permanent loan modification.  She asserts that plaintiff has breached the "contract" and her state-law claims all arise pursuant to the defendant's alleged failure to comply with its "contractual obligations."

The defendant, on the other hand, contends that the TPP Agreement is governed by HAMP and that plaintiff lacks standing to bring this lawsuit in the first place because HAMP does not provide a private cause of action.   Defendant further contends that plaintiff's state-law claims are an attempt to circumvent the fact that HAMP does not provide a private cause of action.  It argues that where federal law fails to provide a private cause of action, state-law claims must fail as well.  In the alternative, it argues that each of the state-law claims substantively fail under Missouri law.  Plaintiff counters that the fact the TPP Agreement has a relationship to a federal statute and regulations does not require the dismissal of any state-law claims that may arise pursuant to the TPP Agreement.  Plaintiff argues that if the Court construes the TPP Agreement as a valid contract between the parties, then plaintiff has standing to bring suit to recover for any breach of that contract, or any tort claim arising from the contractual relationship.

### No cause of action under HAMP

The majority of courts have held that HAMP does not provide a private right of action for borrowers, including courts in this district as well as other districts in the Eighth Circuit.  *See*, Bohnhoff v. Wells Fargo Bank, N.A., 853 F.Supp.2d. 849, 853 (D.Minn. 2012); Topchian v. JPMorgan Chase Bank, N.A., 2013 WL 1628525 (W.D.Mo. April 16, 2013); Meng v.

Citimortgage, Inc., 2013 WL 1319008 (E.D.Mo. March 29, 2013); Foster v. Deutsche Bank National Trust Co., 2012 WL 5285887 (E.D.Mo. Oct. 25, 2012); Haapala v. Bank of America, N.A., 2012 WL 1883816 (D.Minn. May 22, 2012); Maxwell v. Aurora Loan Services, LLC, 2011 WL 4014327 (E.D.Mo. Sept. 9, 2011). Thus, to the extent that the plaintiff is attempting to state a claim under HAMP or seeking to enforce HAMP guidelines, such claims are dismissed with prejudice.

## HAMP Preemption

However, the plaintiff asserts that her claims do not arise under HAMP but rather arise from the defendant's alleged breach of her TPP "contract." Defendant argues that even so, plaintiff's claims should be dismissed because they arise out of the denial of a loan modification directly connected to the HAMP Guidelines; i.e. the HAMP Guidelines govern whether or not a permanent loan modification is offered to a borrower. Defendant contends that HAMP preempts the plaintiff's state-law claims citing support under Morrison v. Back Yard Burgers, Inc., 91 F.3d. 1184 (8th Cir. 1996) and Freitas v. Wells Fargo Home Mortgage, Inc., 2011 WL 8844639 (W.D.Mo. Nov. 14, 2011). Plaintiff relies primarily upon Wigod v. Wells Fargo Bank, N.A., 673 F.3d. 547 (7th Cir. 2012) in support of her contention that HAMP does not preempt state common law claims.

The parties' pleadings clearly show that the courts are greatly divided on the issue of HAMP preemption. However, this Court need only to look within its own circuit to find the road best taken in addressing this issue. In Cox v. Mortgage Electronic Registration Systems, Inc., 685 F.3d. 663 (8th Cir. 2012), is instructive even though the Eighth Circuit did not directly address the issue of HAMP preemption. The Minnesota district court had dismissed the plaintiffs' state-

law claims pursuant to Rule 12(b)(6) Fed.R.Civ.P. because the it found the claims were entirely based on the loan modification request under HAMP and that HAMP did not create a private cause of action. *Id.*, at 667-68. The Eighth Circuit reviewed each state-law claim *de novo* under Minnesota law and whether the plaintiffs plead plausible claims under Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). In a final footnote, the Court did express its concern with the district court's analysis of HAMP preemption of state law claims. "While the district court's analysis of HAMP preemption in this case may be questionable, we need not address this issue because we find that the complaint fails to meet the *Twombly* pleading standards." Id., at 675, n.4.

In Freitas, at 2011 WL 8844639, the plaintiffs argued that their state-law claims were not preempted under HAMP; however, since the issue had not been raised by the defendant, the district court explicitely stated that it was "declin[ing] to address the issue of preemption." Id., at *2. Instead, the district court determined that the issue before it was whether the plaintiffs' complaint should be dismissed because it was an attempt to bring a private cause of action under HAMP using state common law claims or whether the complaint set forth claims that could stand on their own merit. Id., at *2. The district court then analyzed each of the claims and determined that the plaintiffs had no right, under either state or federal law, to modify their loan payments. The district court found that the plaintiffs had stopped making their mortgage payments knowing that they had not received a loan modification under HAMP and should have anticipated the resulting foreclosure. Id., at *4. Given this finding, the district court held that:

> To take the HAMP application process and Plaintiffs' essential claim that they were wrongfully denied a modification under HAMP and turn it into state law claims for which the requested relief would include a modification of the mortgage payment and setting aside of the foreclosure would be 'boot strapping' at its finest. The long and short of all of this is simply that Plaintiffs applied for relief under a federal

> program, they were never approved for relief, and Plaintiffs stopped payment on their loan. If you do not have a *right* to obtain the relief, conflicting representations about whether or not you *will* qualify for the relief mean nothing. Certainly there was nothing about any of this process that could reasonably be interpreted as giving rise to a basis for Plaintiffs to stop all payments on their loan. This would not have been the result even if they qualified under HAMP.

Id., at *4. On appeal, the Eighth Circuit again summarily addressed the issue of HAMP preemption by noting that the district court had stated that the plaintiffs/appellants claimed not to have asserted any claim under HAMP, and that even on appeal, the plaintiffs/appellants have not addressed the issue of whether there is a private cause of action under HAMP. Freitas v. Wells Fargo Home Mortgage,, 703 F.3d. 436, 438, n.3 (8th Cir. 2013). Thus, the Eighth Circuit refused to address the question of whether the homeowners had a cause of action under HAMP because it had not been properly presented for determination by the Court. Id., 703 F.3d. at 438, n.3.

In Topchian v. JPMorgan Chase Bank,, 2013 WL 1628525 (W.D.Mo. April 16, 2013), the plaintiff had been denied twice for a loan modification under HAMP. He filed a complaint alleging several state-law claims arising from the HAMP modification denials. In addressing the defendant's motion to dismiss, the district court noted that it had previously found that there was no private right of action for a loan modification under HAMP. Id., at *2. To the extent that the plaintiff's claims were an attempt to state a claim under HAMP, the district court dismissed them. However, to the extent that the claims were being pursued as independent state-law claims, the Court noted that some courts had held that HAMP did not preempt all state common law claims. Id., at *2. The district court further cited Cox, *supra.* noting that the Eighth Circuit had not made a definitive ruling on HAMP preemption. Following the Eighth Circuit's lead, the Topchian Court decided that since the plaintiff's claims failed as a matter of law, the Court did

not need to decide whether HAMP preempts all private causes of action or bars all state common law claims.  Topchian, at *2.

In Bohnhoff v. Wells Fargo Bank, N.A., 853 F.Supp.2d. 849 (D.Minn. 2012), the plaintiff had applied for a loan modification under HAMP.  She made payments pursuant to a TPP Agreement; however, her request for the permanent loan modification was denied because her NPV calculation made her ineligible for a modification.  Plaintiff filed a lawsuit asserting various state-law claims arising from the denial of a permanent loan modification under HAMP.  Her claims related to her belief that she was entitled to a HAMP modification based on the TPP.

The Minnesota district court first addressed the defendant's argument that the plaintiff's claims were barred because HAMP lacks a private cause of action.  The Court noted that the defendant rested its argument on Cox, *supra.*  The plaintiff countered that Cox did not create an absolute shield for lenders under state law.  The Minnesota district court agreed with the plaintiff.

> *Cox* did not consider whether state law claims that implicate HAMP are preempted.**[In a footnote, the district court stated that 'Preemption is a powerful doctrine that the court does not invoke with a single sentence.  As in *Cox*, the court need not address the question of preemption, because each of Bohnhoff's claims fail on the merits.']** Instead, in *Cox*, the court determined that the lack of a private cause of action reinforces the fact that HAMP, the ESSA and entry into a Trial Period Plan do not create an unconditional entitlement to a loan modification.  As a result claims in *Cox* failed on the merits.

Bohnhoff, at 853-54 (inc. n.2).  Thus, the Bohnhoff court followed the Cox methodology and addressed each of the state-law claims on the merits instead of addressing the question of HAMP preemption.

However, in Olivares v. PNC Bank, N.A., 2011 WL 4860167 (D.Minn. Oct. 13, 2011), the district court, after doing an exhaustive review of the preemption doctrine, concluded that (in

a HAMP loan modification denial case) the "mere fact Plaintiffs' claims arise from a fact pattern implicating HAMP does not preclude them from asserting claims premised upon the common law and statutory law of Minnesota. HAMP does not preempt those claims." Id., at *5.

The Court has carefully reviewed the plaintiff's cited caselaw in which a court has concluded that HAMP and/or the HAMP Guidelines do not preempt state-law claims regarding a denial of a permanent loan modification. *See*, Wigod v. Wells Fargo Bank, N.A., 673 F.3d. 547 (7thCir. 2012). However, considering that these cases are non-binding as they are outside the Eighth Circuit, this Court is constrained to follow the decisional pattern predominantly existing thus far within the Eighth Circuit. It is this Court's decision that the Court need not address the question of preemption because each of the plaintiff's claims fails to state a claim under Missouri law.[4]

### **Breach of Contract (Count I)**

Under Missouri law, a breach of contract action requires a plaintiff to allege 1) the existence and terms of a valid and enforceable contract between the plaintiff and defendant; 2) the rights of the plaintiff and the obligations of the defendant under the contract; 3) breach of the

---

[4]The Court also reviewed defendant's cited case of Morrison v. Back Yard Burgers, Inc., 91 F.3d. 1184, 1187 (8th Cir. 1996) for the proposition that a plaintiff cannot plead state-law claims intending to circumvent a federal statute which does not provide a private cause of action. In Morrison, *supra.*, the plaintiff attempted to bring a state-law claim for fraud by pleading violations of FTC regulations. The Court denied the claim stating that "A plaintiff should not be permitted to plead violations of FTC regulations as part of a state common law fraud case. A decision to the contrary could be interpreted as substituting violation of FTC regulations for state law requirements, thereby effectively extending a private cause of action under the Federal Trade Commission Act." Id., at 1187. Upon review, the Court finds that the holding is limited to the facts of the case; i.e., the plaintiff was attempting to use FTC regulation violations to demonstrate bad faith intent under an exception to the general Arkansas state common law rule that mere opinion cannot support a fraud claim. No other Eighth Circuit case, especially concerning Missouri common law, has extended this holding for a wholesale proposition that where federal law fails to provide a private cause of action, state law claims must fail also; and this Court, chooses not to do so at this time.

contract by the defendant; and 4) damages suffered by the plaintiff due to the breach.  Holmes v. Kansas City Missouri Board of Police Commissioners, 364 S.W.3d. 614, 622 (Mo.App. 2012); Teets v. American Family Mut. Ins. Co., 272 S.W.3d. 455, 461 (Mo.App. 2008); *see also*, Cento v. Allstate Prop. & Cas. Ins. Co., 2013 WL 64752, *3 (E.D.Mo. Jan. 4, 2013)(*citing* Teets, *supra.*); Bakhtiari v. Al-Khaledy, 2011 WL 6945107, *4 (E.D.Mo. Dec. 30, 2011)(*citing* Teets, *supra.*); Midwest Special Surgery, P.C. , at *6 (*citing* Teets, *supra.*).  A party "fails to state a claim for breach of contract [if] it does not set out [the claimant's] rights or [the defendant's] obligations under the contract." Trotter's Corp. v. Ringleader Restaurants, Inc., 929 S.W.2d. 935, 941 (Mo.App. 1996); Cento, at *3 (*quoting* Trotter's Corp., *supra.*); Bakhtiari, at *4 (*quoting* Trotter's Corp., *supra.*); Midwest Special Surgery, at 6 (*quoting* Trotter's Corp., *supra.*).  Vague references to unspecified "agreements" are insufficient to state a claim for breach of contract.  Midwest Special Surgery, at *6; Cento, at *3 (*citing* Midwest Special Surgery, *supra.*); Bakhtiari, at *4 (*citing* Midwest Special Surgery, *supra.*).

The essential elements of a valid contract are offer, acceptance, and bargained for consideration.  Miller v. Dombek, 390 S.W.3d. 204, 207 (Mo.App. 2012);  Marzette v. Anheuser-Busch, Inc., 371 S.W.3d. 49, 52 (Mo.App. 2012); Holmes, at 622 (*citing* Johnson v. McDonnell Douglas Corp., 745 S.W.2d. 661, 662 (Mo. 1988)); Doran v. Chand, 284 S.W.3d. 659, 664 (Mo.App. 2009).  "Consideration generally consists either of a promise (to do or refrain from doing something) or the transfer or giving up of something of value to the other party." Miller, at 207 (*quoting* Morrow v. Hallmark Cards, Inc., 273 S.W.3d. 15, 25 (Mo.App.2008); Marzette, at 52 (*quoting* Frye v. Speedway Chevrolet Cadillac, 321 S.W.3d. 429, 438 (Mo.App. 2010).  A promise to do that which a party is already legally obligated to do cannot serve as consideration for a contract.  Miller, at 208; Doran, at 665.

Plaintiff contends that the TPP Agreement was a consummated contract which defendant breached by denying her a permanent loan modification. She asserts that she made all the payments required and provided all requested financial and other information; thus, she was entitled to a permanent loan modification. Defendant contends that the TPP Agreement was not a "contract" but simply a mechanism by which to qualify the plaintiff for a permanent loan modification; that making the required payments and furnishing the requisite information were just some of the conditions that had to be met to be considered for a permanent loan modification, and that due to other HAMP criteria plaintiff did not qualify for a permanent loan modification. Defendant further contends that regardless of the fact that the TPP Agreement does not guarantee a permanent loan modification if the plaintiff makes timely TPP payments and provides all requested information, plaintiff's breach of contract claim must fail because 1) the TPP does not promise a permanent modification; 2) the TPP fails as a "contract" for lack of consideration; and 3) the TPP fails as a "contract" because it does not contain any of the essential terms for the supposed loan modification.

Plaintiff's breach of contract claim fails for several reasons.

Firstly, upon review of the initial TPP offer letter, the TPP Agreement itself, and the HAMP Guidelines, it is clear that the loan servicer (the defendant) is given discretion in providing a loan modification. Reading these documents as a whole demonstrates that they emphasized the fact that a borrower had to make timely payments under the TPP, provide information as requested, and meet **other criteria such as the NPV standard** in order to qualify for a HAMP loan modification. Plaintiff fails to point to any statement in any document which clearly states that simply by making the payments and providing information automatically qualified her for a loan modification. Furthermore, nowhere in her complaint does the plaintiff

contend that defendant failed to evaluate her application properly under the HAMP Guidelines or that defendant made an erroneous calculation of the NPV. All plaintiff has done is allege that she was in "compliance" with the TPP by making timely payments and providing information as requested, but she fails to allege that she "qualified" for the HAMP loan modification. Plaintiff equates "compliance" with "qualification" yet fails to make any allegation or point to any support for this supposition.

The letter of July 10, 2009 offering the plaintiff the opportunity to seek a HAMP loan modification makes the distinction between "qualification" and "compliance." Plaintiff's Exhibit D. It states "If you **qualify** under the federal government's Home Affordable Modification program and **comply** with the terms of the Trial Period Plan, we will modify your mortgage loan and you can avoid foreclosure." Plaintiff's Exhibit D (emphasis added). The letter further states that the TPP payments are simply an "estimate" of the plaintiff's monthly mortgage payment "IF we are able to modify your loan under the terms of the **program**." Plaintiff's Exhibit D (emphasis added). There is a distinction between determining compliance with the TPP Agreement and determining whether the plaintiff qualified for a permanent loan modification. Compliance with the TPP was a factor for consideration of a permanent loan modification; however, it was not the only factor as there were other "terms" of the HAMP program that had to be considered before determining whether the plaintiff qualified for a loan modification. *See*, Senter v. JPMorgan Chase Bank, N.A., 810 F.Supp.2d 1339, 1357 (S.D.Fla. 2011).

The TPP itself states that the TPP is "not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (I) I meet all of the conditions required for modification, (II) I receive a fully executed copy of a Modification Agreement, and (III) the Modification Effective Date has passed." Plaintiff's Exhibit F. Again, the TPP does not

stipulate that by making the payments and providing information the plaintiff would automatically receive a permanent loan modification. Instead, it states that the TPP is not a modification of the original loan documents until such time it is determined that plaintiff has met **all conditions** required for modification and has received a fully executed copy of a Modification Agreement. Nowhere in her complaint does the plaintiff allege that she has met "all conditions" as required for modification (said conditions being set out in the HAMP Guidelines) or that she received a fully executed copy of a Modification Agreement. Plaintiff clearly fails to allege that she and the defendant signed an executed a "Modification Agreement" as required by the TPP Agreement itself.

The plain language of the cover letter of July 10, 2009 and the TPP itself does not support the plaintiff's contention that the TPP was a contract entitling her to a loan modification. The Court concurs with the <u>Senter</u> Court's conclusion (in a similar case) that "[T]he plain language of the TPP Agreements does not explicitly guarantee permanent loan modifications for the Plaintiffs, but rather, establishes the rights and obligations of the parties to the agreement during a trial period after which the Defendants may extend permanent loan modifications to the Plaintiffs if the Defendants determine that they qualify." <u>Senter</u>, at 1351.

As previously stated, the plaintiff must plead the existence of an offer, acceptance of the offer, consideration, and sufficient specification of the essential terms of the agreement in order to establish the existence of an enforceable contract under Missouri law. Disregarding for the moment whether an actual offer was made and accepted, the primary issues are whether the plaintiff has adequately plead consideration and the essential terms in order for this Court to find the TPP Agreement was a valid enforceable contract.

Plaintiff contends that she provided consideration for the TPP "contract" by making the reduced mortgage payments and providing all additional requested information. Defendant argues that the performance of a preexisting duty does not constitute consideration necessary to support a valid contract.

As stated earlier, under Missouri law, performance of a preexisting duty does not constitute sufficient consideration to support a valid contract. *See*, Miller, *supra.*; Marzette, *supra.*; Doran, *supra.* The TPP Agreement clearly provides that all terms and provisions of the original loan documents remained in full force and effect during the TPP term and receipt of the TPP payments were without prejudice to or a waiver of the acceleration of the loan or any possible foreclosure proceedings. Furthermore, the reduced TPP payments were less than what the plaintiff was already legally obligated to pay pursuant to her original mortgage documents. Thus, the TPP payments can not be considered "consideration" for the TPP Agreement as a valid contract. Senter, at 1346-48; Citimortgage v. Crawford, 2013 WL 1225387, *4-*5 (S.D.Ohio March 26, 2013); *see also*, Lonberg v. Freddie Mac, 776 F.Supp.2d. 1202 (D.Oregon 2011)(lender's failure to provide a permanent loan modification under HAMP based upon existence of TPP Agreement and payment of all trial period payments and submission of financial documents fails to state a breach of contract claim under Oregon law); Pennington v. HSBC Bank USA, N.A., 493 Fed.Appx. 548, 555 (5th Cir. 2012)(unpublished)(no mutual intent expressed in TPP that trial payments created a binding contract); *but see*, Bosque v. Wells Fargo Bank, N.A., 762 F.Supp.2d. 342, 352 (D.Mass. 2011)(payment of trial plan payments constituted new legal detriments to plaintiffs that flowed from their TPP Agreements).

As for the provision of additional financial information, the Court finds that such a requirement was simply part of the application process which any borrower under HAMP,

including the plaintiff, would lead to a permanent loan modification if such financial information met the criteria established by the HAMP Guidelines. *See*, Senter, at 1348-49; Citimortgage v. Crawford, 2013 WL 1225387, *5 (internal citations omitted). Plaintiff's cited caselaw[5] finding such documentation to be sufficient consideration for the TPP Agreement to be a valid contract for a permanent loan modification fails to acknowledge that the provision of financial information is an on-going obligation under original mortgage documents and/or that providing this information is a condition of the application and not for an agreement to permanently modify a loan. This Court agrees with the finding of the Senter Court that "the provision of additional documentation was required to pre-screen applications for qualification for a TPP Agreement". Senter, at 1349.

Thus, the Court finds that the plaintiff's TPP payments and provision of financial information does not constitute sufficient consideration for the TPP Agreement to qualify as a binding contract between the parties entitling the plaintiff to a modified loan mortgage.

Defendant further argues that plaintiff's breach of contract claim must fail because the TPP Agreement lacks the essential terms of a contract as required by Missouri law. It argues that the plaintiff has failed to allege the "essential terms" of the permanent loan modification as allegedly provided by the TPP Agreement. Plaintiff counters that the TPP Agreement is a valid contract promising to provide the plaintiff with a permanent loan modification with the terms to be determined by formulas established under HAMP; thus, the TPP Agreement constitutes a valid contract under Missouri law. It appears, then, that the plaintiff is alleging that the TPP

---

[5] Bosque, *supra.*; Turbeville v. JPMorgan Chase Bank, 2011 WL 7163111 (C.D.CA. April 4, 2011); Durmic v. JPMorgan Chase Bank, 2010 WL 4825632 (D.Mass. Nov. 24, 2010).

Agreement is a valid contract to receive a permanent loan modification at a later date under terms to be determined later by the defendant.

Under established Missouri law, no contract exists where the essential terms of the purported contract are reserved for future determination. <u>Olson v. Curators of the University of Missouri, et. al.</u>, 381 S.W.3d. 406, 411-12 (Mo.App. 2012); <u>Birkenmeier v. Keller Biomedical, LLC.</u>, 312 S.W.3d. 380, 392 (Mo.App. 2010); <u>Frick's Meat Products, Inc. v. Coil Construction of Sedalia, Inc.</u>, 308 S.W.3d. 732, 738 (Mo.App. 2010); <u>Around the World Imports v. Mercantile Trust Co.</u>, 795 S.W.2d. 85, 90 (Mo.App. 1990); <u>Bryant v. Bryan Cave LLP</u>, 2013 WL 428738, *14 (Mo.App. Feb. 5, 2013). Although a court may infer non-material terms into a contract, a court may not infer the essential terms of a purported contract. <u>Olson</u>, at 411-12; <u>Bryant v. Bryan Cave</u>, 2013 WL 428738, *14 (*citing* <u>Olson</u>, *supra.*). In determining whether an enforceable contact has been formed, the essential terms of unperformed promises must be alleged although not every detail or particulars need to be alleged. <u>Olson</u>, at 412 *citing* <u>Shellabarger v. Shellabarger</u>, 317 S.W.3d. 77, 82 (Mo.App. 2010). What is considered to be an "essential term" depends on the agreement and its context, and also the subsequent conduct of the parties, including the dispute which arises and the remedy sought. <u>Olson</u>, at 412 *citing* <u>Shellabarger</u>, *supra.*; <u>Bryant v. Bryan Cave</u>, 2013 WL 428738 at *14 (*citing* <u>Shellabarger</u>, *supra.*).

Here, neither the letter of July 10, 2009 nor the TPP Agreement itself promises or states specific terms of any contemplated permanent loan modification including such as the interest rate, the loan term, the new principal amount, and most importantly, the new permanent monthly payment amount. The letter clearly provides that the monthly trial payments are nothing more than "estimates" **if** the defendant is able to modify the loan under the terms of HAMP. Thus, the TPP payments are not an essential term of any valid contract since they are "estimates" and not

the promised new monthly mortgage payments. Nowhere in the TPP Agreement is there any

mention of a new loan term, an interest rate, or a new principal amount. In fact, the TPP

Agreement clearly states that all terms and provisions of the plaintiff's original loan documents

remained in full force and effect, and that nothing in the TPP Agreement should be construed as

a waiver, satisfaction, or release in whole or part of the obligations as set out in the plaintiff's

original loan documents. Plaintiff's Exhibit F. Furthermore, the TPP Agreement clearly states:

> **The Modification.** I [the plaintiff] understand that once
> Lender [defendant] is able to determine the final amounts of
> unpaid interest and any other delinquent amounts (except late
> charges) to be added to my loan balance and after deducting
> from my loan balance any remaining money held at the end
> of the Trial Period under Section 2.D. above, the Lender will
> determine the new payment amount. If I comply with the
> requirements in Section 2 and my representations in Section 1
> continue to be true in all material respects, the Lender will send
> me a Modification Agreement for my signature which will
> modify my Loan Documents as necessary to reflect this new
> payment amount and waive any unpaid late charges accrued to
> date. Upon execution of a Modification Agreement by the Lender
> and me, this Plan shall terminate and the Loan Documents, as
> modified by the Modification Agreement, shall govern the terms
> between the Lender and me for the remaining term of the loan.

Plaintiff's Exhibit F, §3. Thus, the TPP Agreement itself acknowledges that it does not contain

the essential terms of any new mortgage contract, and that such terms would only be found in a

Modification Agreement if one were sent to the plaintiff for signature and executed by both

parties. The plain language of the TPP Agreement only establishes the rights and obligations of

the parties to the agreement during a trial period after which the defendant may extend a

permanent loan modification to the plaintiff, if she qualified. The nature and timing of the

permanent loan agreement is left undetermined as the TPP Agreement fails to establish any of the

terms governing the potential permanent loan modification. The TPP Agreement is indefinite

and uncertain as to the essential terms of a permanent loan modification, therefore, it fails to rise

to the level of a valid enforceable contract under Missouri law.  *See*, <u>Senter</u>, at 1350-51; <u>Gass v. Citimortgage, Inc.</u>, 2012 WL 3201400, *8-*9 (N.D.Ga. June 25, 2012)(concurrence with courts around the country who have rejected breach of contract claims against lenders for failure to permanently modify a mortgage after completion of a TPP because no binding contract is formed when a lender offers to permanently modify a loan in the future, pursuant to undefined terms, upon successful completion of the TPP).

Thus, under established Missouri law[6], the TPP was not a valid enforceable contract requiring the permanent modification of the plaintiff's mortgage.  Plaintiff has failed to state a plausible claim for breach of contract in Count I of the Complaint as she has failed to allege with any specificity the essential terms of any such binding contract.[7]

### Promissory Estoppel

Plaintiff contends that she detrimentally relied upon the clear promise of the TPP Agreement that as long as she complied with the TPP Agreement she would receive a permanent loan modification.  She further argues that she detrimentally relied on this promise because

---

[6]Once again, the Court has reviewed the plaintiff's cited caselaw on this issue but again concludes that these cases do not represent Missouri contract law and therefore are not binding upon this Court.

[7]In addition to the stated grounds for finding that the plaintiff's Count I breach of contract fails to state a claim for which relief can be granted, the Court finds the reasoning of the <u>Senter</u> Court persuasive regarding the plaintiff's reliance upon the HAMP Guidelines to provide the essential terms of the TPP as a permanent loan modification contract.  The <u>Senter</u> Court found that the plaintiff's reliance upon the HAMP Guidelines, instead of any formula or calculations contained in the TPP, to provide the essential contract terms was an improper attempt to assert a private cause of action under HAMP.  <u>Senter</u>, at 1350-51 *citing* <u>Bourdelais v. JP Morgan Chase Bank</u>, 2011 WL 1306311, *4 (E.D.Va. April 1, 2011).  The Court found that "since the TPP Agreements do not specifically incorporate the HAMP Guidelines into the performance of their underlying obligations, any reference to such guidelines represents an improper attempt to assert a private cause of action under the HAMP."  <u>Senter</u>, at 1351.  This Court notes that plaintiff Reitz has made the same improper attempt to assert a private cause of action under HAMP.

she didn't use the money that she used for her trial payments for other avenues of resolution such as funding bankruptcy plans, relocation costs, short sales, or otherwise curing the default so as to halt any foreclosure proceedings by the defendant.

Defendant argues that the TPP Agreement did not make a "clear and unambiguous" promise of a guaranteed permanent loan modification upon only compliance with the TPP. Furthermore, the detriments pled by the plaintiff would have resulted under the original loan documents; thus, said detriments do not exist due to plaintiff's reliance upon the purported promise of a permanent loan modification via the TPP Agreement.

Under Missouri law, a claim for promissory estoppel allows the courts to enforce a promise on equitable grounds even if the parties have not entered into a contract. The 1861 Group, LLC v. Wild Oats Markets, Inc., 728 F.Supp.2d. 1052, 1059 (E.D.Mo. 2010)(citing City of St. Joseph v. SW Bell Tel., 439 F.3d. 468, 477 (8th Cir. 2006). Promissory estoppel requires: 1) a promise; 2) on which a party relies to his or her detriment; 3) in a way the promisor expected or should have expected; and 4) resulting in an injustice that only enforcement of the promise could cure. Freitas, 703 F.3d. at 440-41; The 1861 Group, at 1059; Clevenger v. Oliver Ins. Agency, 237 S.W.3d. 588, 590 (Mo. 2007); Glenn, MD, et. al. v. Healthlink HMO, Inc., et. al., 360 S.W.3d. 866, 877 (Mo.App. 2012); Birkenmeier, at 388-89; see also, Meng v. Citimortgage, 2013 WL 1319008, at *7. "In Missouri, promissory estoppel is not a favorite of the law, and each element must clearly appear and by proven by the party seeking its enforcement." Glenn, MD., at 877 quoting Clevenger, at 590; Birkenmeier, at 389. The doctrine of promissory estoppel should applied "with caution, sparingly, and only in extreme cases to avoid unjust results." The 1861 Group, at 1059 quoting City of St. Joseph, at 477.

The promise giving rise to the claim for promissory estoppel must by definite and the promise must be made in a contractual sense.  <u>Clevenger</u>, at 590 (citation omitted).

> [a] promise is a manifestation of intention to act or refrain from acting in a specific way, so made as to justify a promisee in understanding that a commitment has been made.  A promise is the promisor's expression of an intention to bring about a specified result in the future.  The promise must be definite and made in a contractual sense.  A supposed promise that is wholly illusory or a mere expression of intention, hope, desire, or opinion, which shows no real commitment, cannot be expected to induce reliance.

<u>Freitas</u>, at 440 *quoting* <u>City of St. Joseph</u>, *supra.*   Finally, under Missouri law, "the promise element cannot be based on preliminary negotiations and discussions or an agreement to negotiate the terms of a future contract."  <u>The 1861 Group</u>, at 1059-60 *citing* <u>Prenger v. Baumhoer</u>, 939 S.W.2d 23, 27 (MoApp. 1997).  Missouri law requires "a promise be as definite and delineated as an offer under contract law."  <u>Frietas</u>, at 440 *quoting* <u>Prenger</u>, *supra.*

Firstly, as previously found by this Court, the TPP Agreement did not make a "clear and unambiguous promise" that in exchange for timely reduced payments and fulfilling the TPP document requirements, defendant would provide the plaintiff with a permanent loan modification.  On the contrary, the TPP Agreement only promised that if the plaintiff complied with the TPP Agreement and defendant found plaintiff to be **qualified** pursuant to the HAMP Guidelines, she would be offered a permanent loan modification.  Moreover, the TPP further stated that the plaintiff may or may not qualify for a HAMP modification, and if she did, she would receive a Loan Modification Agreement which, **upon execution by both parties**, would replace both the TPP Agreement and plaintiff's original loan documents.  Plaintiff fails to allege that defendant found plaintiff to be qualified under HAMP, or that she received either a fully executed TPP Agreement or a Loan Modification Agreement.

As previously found by the Court, the plain language of the July 10, 2009 letter and the TPP Agreement fails to make any enforceable promise that mere compliance with the TPP Agreement automatically ensured a permanent loan modification for the plaintiff. *See*, Citimortgage v. Crawford, 2013 WL 1225387, at*6; Stolba v. Wells Fargo, 2011 WL 3444078, *3 (D.N.J. Aug. 8, 2011); Bourdelais, 2011 WL 1306311, at *4. Furthermore, given the lack of a definite promise of a permanent loan modification in exchange for timely trial payments and provision of financial information, plaintiff's "detrimental reliance" was unreasonable given the plain language of the TPP Agreement.

Finally, the Court finds that plaintiff's examples of "detrimental reliance" are inadequate to support her claim of promissory estoppel. Plaintiff alleges that instead of making the TPP payments, she would have used the money to fund a bankruptcy plan, pay relocation costs, short sales or towards other means of curing her default. Firstly, as stated above, given the plain language of the July 10, 2009 letter and the TPP Agreement, it was unreasonable for the plaintiff to forgo any "alternative avenues of resolution." Moreover, the HAMP Guidelines specifically provide that a borrower may pursue bankruptcy or a short sale and still be considered for a HAMP modification. Defendant's Exhibit C, pg. 54. Finally, the TPP Agreement clearly warned the plaintiff that her reduced payments did not cure any pre-existing default or would not waive any right to accelerate the original loan or foreclose based upon a default. Thus, plaintiff was informed that while she was making the reduced payments and providing the requested financial information, she was still at risk for default that could result in a foreclosure. Thus, given again the plain language of the TPP documents, defendant could not reasonably foresee

that plaintiff would forgo "alternative avenues of resolution" in reliance upon a "promise of a permanent loan modification."[8]

Plaintiff has failed to state a claim for promissory estoppel for which relief can be granted.

## Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiff alleges that the defendant was obligated by contract or common law to act in good faith and to deal fairly with the plaintiff and that defendant breached the implied covenant of good faith and fair dealing in several ways, including but not limited to, failing to perform loan servicing functions consistent with its responsibilities; failing to properly supervise is agents and employees as to loss mitigation, debt collection, and foreclosure; failing to make accurate calculations and determinations as to plaintiff's eligibility for HAMP, failing to follow through on its contractual obligations by not providing the plaintiff with a permanent loan modification; and routinely demanding information it had already received.  Plaintiff's Complaint [1], ¶¶111-114.

Under Missouri law, a claim for breach of the covenant of good faith and fair dealing is a contractual claim.  Hardee's Food Systems, Inc. v. Hallbeck, et. al., 776 F.Supp.2d 949, 952 *citing* Koger v. Hartford Life Ins. Co., 28 S.W.3d 405, 413 (Mo.App. 2000); Safeco Ins. Co. of America v. Lake Asphalt Paving & Construction LLC, 2012 WL 666575, *4 (E.D.Mo. Feb. 28, 2012)(internal citations omitted).  Missouri law implies a covenant of good faith and fair dealing in every contract.  BJC Health System, 478 F.3d 908, 914 (*citing* Farmers' Elec. Coop. v.

---

[8]Furthermore, a promissory estoppel claim cannot exist wherein as here, there is no definite "promise" but rather only a contemplation that upon completion of the TPP Agreement requirements, and a determination that plaintiff qualified under the HAMP Guidelines, a future contract with specific essential terms would be offered.

Missouri Dept. of Corrections, 977 S.W.2d. 266, 271 (Mo. 1998); Cordry v. Vanderbilt Mortgage & Finance, Inc., 445 F.3d. 1106, 1112 (8th Cir. 2006)(*citing* Farmers' Elec. Coop., *supra.*); Citimortgage, Inc. v. Just Mortgage, 2012 WL 1060122, *15 (E.D.Mo. March 29, 2012)(*citing* Farmers' Elec. Coop., *supra.*); Citimortgage, Inc. v. Mason Dixon Funding, 2011 WL 1344031, *3 (E.D.Mo. April 8, 2011)(*citing* Farmers' Elec. Coop.); Missouri Consolidated Health Care Plan v. Community Health Plan, 81 S.W.3d. 34, 45 (Mo.App. 2002). This duty arises pursuant to contract and is a "contract remedy".  Koger v. Hartford Life Ins., at 412.  "This good faith requirement extends to the manner in which a party employs discretion conferred by a contract." BJC Health Systems, at 914 *citing* Mo. Consol. Health Care Plan, at 45. The good faith obligation requires the contracting parties not to prevent or hinder performance of the contract by either party.  Finova  Cap. Corp. v. Ream, 230 S.W.2d. 35, 45 (Mo.App. 2007); Schell v. LifeMark Hosps. of Missouri, 92 S.W.3d. 222, 230 (Mo.App. 2002); TVI, Inc. v. Infosoft Technologies, Inc., 2008 WL 239784, *16 (E.D.Mo. January 28, 2008)(*citing* Schell, *supra.*).  "A breach of the covenant of good faith and fair dealing occurs where one party 'exercise[s] a judgment conferred by the express terms of the agreement in such a manner as to evade the spirit of the transaction or so as to deny [the other party] the expected benefit of the contract.'" Cordry, at 1112 *quoting* Mo. Consol. Health Care Plan, at 46; *see*, BJC Health Systems, at 914 (*quoting* Mo. Consol. Health Care Plan, *supra.*).  To establish a violation of the covenant of good faith and fair dealing, a plaintiff must show more than just the defendant made an erroneous decision but that "the decision was made in bad faith or was arbitrary or capricious so as to amount to an abuse of discretion."  Cordry, at 1112 *citing* Mo. Consol. Health Care Plan, at 48-49; *see*, BJC Health Systems, at 914; Citimortgage v. Just Mortgage, at *15 *citing* Mo. Consol. Health Care Plan, *supra.*. There is no "reasonableness" requirement under the covenant,

and there is no breach of the covenant if a party exercises its discretion in making a business judgment.  BJC Health Systems, at 914 (citation omitted); Cordry, at 1112 *citing* Mo. Consol. Health Care Plan, at 48-49.  The covenant is also not "an overflowing cornucopia of wished-for legal duties." Comprehensive Care Corp. v. RehabCare Corp., 98 F.3d. 1063, 1066 (8th Cir. 1996); TVI, at *16 (*quoting* Comprehensive Care Corp., *supra.*).  "Although phased in moralistic overtones, good faith does not import into contract law the negligence principles of tort law." TVI, at *16 *citing* Mo. Consol. Health Care Plan, at 47-48.

Firstly, as discussed earlier, the plaintiff has failed to adequately plead that the TPP Agreement was a valid contract that entitled her to a permanent loan modification.  Under Missouri law, a proper pleading of a claim for breach of the covenant of good faith and fair dealing requires the pleading of an existing contract.  Since plaintiff has failed to do this, her claim for breach of the covenant of good faith and fair dealing fails to state a claim upon which relief can be granted.

### Violation of the Missouri Merchandising Practices Act (MMPA)

Plaintiff contends that the defendant violated the Missouri Merchandising Practices Act (MMPA), §407.020 *et. seq.* R.S.Mo., because the failure of the defendant to provide her with a permanent load modification was an "unfair practice" under the Act.  Plaintiff's Complaint [1], ¶124.  Plaintiff contends that by servicing loans, participating in the HAMP loan modification program, and directing its loan services to consumer, the defendant falls within the purview of the MMPA. Defendant counters that 1) it is exempt from the provisions of the MMPA because it is a Missouri Division of Finance licensee, and in the alternative; 2) servicing a loan is not actionable under the MMPA.

In relevant part, the MMPA prohibits:

> [t]he act, use or employment by any person of any deception,
> fraud, false pretense, false promise, misrepresentation, unfair
> practice or the concealment, suppression, or omission of any
> material fact in connection with the sale or advertisement of
> any merchandise in trade or commerce . . . whether committed
> before, during, or after the sale, advertisement or solicitation.

§ 407.020.1 R.S.Mo.; Koster v. Portfolio Recovery Associates, 351 S.W.3d. 661, 664

(Mo.App.2011); Barnes v. Federal Home Loan Mortgage Corp., 2013 WL 1314200, *7 (W.D.

Mo. March 28, 2013); Ball v. The Bank of New York, 2012 WL 6645695, *5 (W.D. Mo. Dec.

20, 2012).

Plaintiff contends that the defendant is not exempt from the provisions of the MMPA

because it lost its exemption with the repeal of Chapter 360 R.S.Mo. **Mortgage Loan**

**Companies** in 1997. Defendant contends that it was never a licensee under repealed Chapter

360 but instead has been licensed, including during the relevant time-period, under Chapter 361

R.S.Mo. **Division of Finance and Powers of Director of Finance**; and has submitted Exhibit D

(a purported screenprint of a license search in the Missouri Division of Finance) as proof of this

licensing. Plaintiff does not dispute the accuracy of this license search or the fact that defendant

was and is currently licensed under the purview of the Missouri Division of Finance.[9]

The MMPA clearly provides for the exemption of its application to certain individuals

and entities, including:

---

[9]The defendant requests that the Court take judicial notice that Nationstar is a registered licensee with the Missouri Department of Finance based on a screenprint of a license search result. Since this "screenprint" is not authenticated nor is a certified copy of a public record and only shows that as of the date of the screenprint (March 22, 2012) defendant was a licensee of the Missouri Division of Finance, the Court will not take judicial notice. However, since the plaintiff raised the issue in her responsive pleadings, and fails to dispute the accuracy of the license search, or offer anything to challenge defendant's assertion that it has always been and continues to be a licensee of the Missouri Division of Finance, the Court will consider this exhibit in its resolution of the instant motion.

2.  Nothing in this section shall apply to:

> (2) Any institution, company, or entity that is subject to chartering, **licensing**, or regulation by the director or the department of insurance, financial institutions and professional registration under chapter 354, RSMo, or chapters 374 to 385, RSMo, the director of the division of credit unions under chapter 370, RSMo, or **director of the division of finance under chapters 361 to 369, RSMo,** or chapter 371, RSMo, unless such directors specifically authorize the attorney general to implement the powers of this chapter or such powers are provided to either the attorney general or a private citizen by statute.

§ 407.020.2.(2) R.S.Mo.

Plaintiff does not challenge the defendant's exemption under the MMPA as a licensee of the Missouri Division of Finance, nor does she contend that she can overcome this exemption by any other particular federal or state statute.  Given that this Court has found that HAMP does not provide a private cause of action, and plaintiff has failed to cite any Missouri statute that would provide her a cause of action independent of the MMPA, the Court finds that defendant is exempt from the application of the MMPA.

Thus, plaintiff's Count IV claim for violation of the MMPA must be dismissed for failure to state a claim upon which relief can be granted.

Furthermore, even if the defendant were not exempt from the application of the MMPA, plaintiff's claim would still fail as a matter of law.  To state a *prima facie* MMPA claim, a plaintiff must allege that she 1) purchased or leased merchandise; 2) primarily for personal, family or household purposes; 3) suffered an ascertainable loss of money or property, real or personal; and 4) as a result of the defendant's use of one of the methods or practices declared unlawful by §407.020 R.S.Mo. §407.025.1 R.S.Mo.; Wivell v. Wells Fargo Bank, N.A., 2013

WL 2089222, *4 (W.D.Mo. May 14, 2013)(*citing* <u>Owen v. Gen. Motors Corp.</u>, 533 F.3d. 913, 922 (8th Cir. 2008)).

In the present case, plaintiff has failed to meet the first element of her MMPA *prima face* case because she did not "purchase or lease" anything. She claims defendant violated the MMPA by not giving her a permanent loan modification upon her compliance with the TPP Agreement. She claims she was damaged by the threat of foreclosure due to the lack of a modification of her original mortgage loan terms. Firstly, under Missouri law, the defendant as a "loan servicer" who was not a party to the initial loan transaction and who may subsequently foreclose on that loan is not liable under the MMPA. <u>Koster</u>, *supra.*; <u>Wivell</u>, 2013 WL 3089222, at *4, n.5 and 6; <u>Barnes</u>, 2013 WL 1314200, at *7. Missouri law holds that a MMPA claim may not be brought against a third-party that was not part of the original transaction. <u>Barnes</u>, 2013 WL 1314200, at *7 *citing* <u>Koster</u>, at 668.

Defendant is a stranger to the original mortgage loan transaction, and plaintiff cannot create a viable MMPA claim by asserting that the relevant transaction is not the original loan but rather the defendant's subsequent actions regarding a possible loan modification and/or possible foreclosure due to default of the original mortgage loan terms. *See*, <u>Barnes</u>, *supra.* "Being foreclosed upon is not purchasing or leasing merchandise; it is not even analogous to purchasing or leasing merchandise. Foreclosure is a legal proceeding for the termination of a mortgagor's interest in property." <u>Wivell</u>, 2013 WL 2089222, at *4 (citation omitted).

Again, plaintiff has no colorable MMPA claim against defendant Nationstar.

Given the Court's findings on the plausible merits of each of the plaintiff's claims, the Court finds no reason to address the defendant's ground for dismissal that plaintiff has failed to plead cognizable damages.

In light of the Court's findings and above-stated reasons, plaintiff has failed to state any claim, as contained in her complaint, against the defendant for which relief can be granted.[10] Defendant Nationstar's motion to dismiss will be granted.

Dated this  27th day of June, 2013.

STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE

---

[10]As plaintiff's individual claims have been dismissed with prejudice, and her purported class claims mirror her individual claims, the findings of this Court are equally applicable to any purported class allegations.